Circuit, we're pleased to have you here today. For the benefit of those who haven't argued here before, you need to pay attention to that yellow light. When it comes on, you've got 2 minutes to complete your argument when the red light comes on. We expect you to bring the argument to a close at that point.  and they are available to the public. So, you need to be on your best Ps and Qs. The final thing I'd mention to you is that rebuttal is for rebuttal only, and we don't expect you to bring up any new arguments in rebuttal that have not previously been addressed, either by you or your opponent. With that, we'll call the first case of the day, and that's Joshua Whitener v. Pliva, Incorporated and others. And Mr. Barney, we'll hear from you, representing the plaintiff appellant, Mr. Whitener. I'm sorry, Jane Barney, not James. Thank you, Your Honor. Good morning, Your Honors. Jane Barney on behalf of the Whiteners. Your Honors, although this is a reguling case, about the only thing we have in common with prior reguling cases is the medication involved. Otherwise, this is different. Ms. Whitener was prescribed metoclopramide very early in her pregnancy, and her baby was born with many problems, including torticollis and mitochondrial dysfunction, problems associated with metoclopramide. First, this case is different because it does not involve a use of the drug for which a federally approved label was issued. Thus, the impossibility preemption of mincing should not have been rubber-stamped here. None of the prior reguling cases addressed by this court turned upon an off-label use of the drug. What is your claim here? What is your claim? I'm sorry, Your Honor? What is the basis of your claim here? Our claim was originally a failure-to-warn claim. Right. What is it now? And it was dismissed by the district court. The district court did keep alive a claim for off-label promotion of the drug. And then he ruled that we did not establish causation for the off-label promotion or misrepresentations by the brand-name defendants. So... What is your claim here is that the injury suffered by your client was based upon the promotional aspects of the drug for use that was not included in the warning approved by the FDA? Right, Your Honor. We contend that the mincing preemption does not apply, and that's one step. But the next step is that even if it did, off-label promotion is not barred by the mincing preemption. Okay, but isn't what you're talking about really failure-to-warn? It is, Your Honor. I mean, because you're just saying that they did not warn you. I mean, they advocated uses not approved by the FDA, and there was no warning with respect to that. Right. So it's a failure-to-warn case. It is a failure-to-warn case. Well, then, if it's a failure-to-warn case, why isn't it preempted? Well, there's two reasons for that. The first, we think, is that it's an off-label use. And if you look at our detailed arguments on this in the record at 1327 to 1345, but the applicable federal labeling requirements that are to be considered for preemption purposes are dictated by the use of the drug. All of the prior cases that have been addressed by this court involve the plaintiff taking the drug for the use that the warning label was approved for, gastroesophageal reflux disease. And I'll point out that defendants are undoubtedly aware that drugs can be approved for more than one use. For example, there's a drug sildenafil. It has two different approved uses, one use approved and marketed as Viagra and the one use approved and marketed as Revatio. Revatio also has an approved generic. Viagra doesn't. Same drug, different use, different dose, different warning. This has been an example of what is reflected in the federal regulations. The use dictates the approval, the use dictates the warning label, and the use dictates the opportunity for a generic to meet its duty of sameness with respect to that use. So without a federally approved warning label... What was it used for in this case with respect to which there was no warning? Warning sickness or nausea and vomiting of pregnancy. And if you get to causation, how do you tie this causation to your client? Well, causation, without the mincing preemption, it's a straight failure to warn case and it shouldn't have been dismissed under the mincing preemption because there was no generic version for this use and therefore no duty of sameness under the impossibility preemption analysis of mincing. The defendants were relieved of the burden of showing that they couldn't comply with federal and state law where there was no federally approved label for this use. But if we find, or if the court should find, that mincing applies, then this case involves off-label promotion of the drug for use in pregnant women. And we demonstrated evidence that the defendants influenced... engaged in off-label promotion and that off-label promotion influenced Dr. McCarlson's decision to prescribe this medicine for Ms. Widener. And she relied on his advice... How did you show that? Or how would you show that? We introduced evidence... Let me get to that portion here. How would you show that he was influenced by the extra-promotional activity on the part of the defendant? Yes, Your Honor, and I would start by saying we did this with no discovery, virtually no discovery. Summary judgment was granted before a 26-F conference and no full discovery was allowed to start. There was limited written discovery, but there was a squabble over initial disclosures and we really never got past that stage. But anyway, on causation. Dr. McCarlson said that he relied... This is a deposition from the medical review panel. He said that he relied on the people who practice his kind of medicine. That was in the district court's opinion. But the district court may not have understood that... what that meant, and I will give him the benefit of the doubt on that. Dr. McCarlson is an OB-GYN, so ACOG... ACOG is the American Congress of OB-GYNs. Those are the folks that practice his kind of medicine. He also said he relied on the ACOG practice bulletin number 52, which is ACOG's publication regarding the treatment for nausea and vomiting of pregnancy. That bulletin number 52 says, use metoclopramide as a step in the treatment for nausea and vomiting of pregnancy. But didn't it list it as the fourth option? It did, and that's where, in the medical malpractice suit, we got into a bit of a dispute in the deposition because Dr. McCarlson was resisting the idea that he had to follow it in order, that you had to start with ginger and crackers or other less intrusive options than going to metoclopramide. But for purposes of the manufacturer claim, Dr. McCarlson did rely on the ACOG bulletin for the fact that it used metoclopramide as one of the steps. Dr. McCarlson said it was okay for him to jump to step 4. But that doesn't really affect the manufacturer claim. The point of it was that the ACOG bulletin 52 at page 6 has an algorithm, and it lists metoclopramide as a treatment for nausea and vomiting of pregnancy. And without any discovery, plaintiffs showed that defendants Teva and Barr Pharmaceuticals supported the group that prepared the algorithm which suggested metoclopramide as treatment for nausea and vomiting of pregnancy, which was adapted into the algorithm on page 6 of the practice bulletin 52, which Dr. McCarlson relied on and brought to his deposition. Didn't it also, the bulletin you're relying on, didn't it also list two other alternative drugs for morning sickness treatment? It did. And for purposes of the manufacturer's liability, what we have focused on is that the off-label promotion that arose from Teva and Barr's support of a publication that came out in the Canadian Family Physician magazine. That algorithm was put out by a group called Mother Risk, which is the service of Otis, and Otis is profoundly grateful to Barr Pharmaceuticals and Teva for their support. So while there may have been other drugs on the algorithm, Dr. McCarlson relied on that algorithm as a justification for using metoclopramide from his Whitener, and that very algorithm came from an algorithm by a group supported by the defendants. And this is without any discovery. This is just intense Internet research. So one can only imagine what we would find in terms of evidence if we were allowed to have any discovery at all. Yet the district court ruled that the Whiteners had failed to establish any causal connection between the alleged activities of the pharmaceutical entities. And if there... I have the record sites here. These documents on Otis and Mother Risk and the Canadian Family Physician algorithm are collectively in our record excerpts at pages 93 through 114. Otis's annual report states they're profoundly grateful to the support of Barr Pharmaceuticals and Teva. The service of Otis is the one who published the algorithm that suggested metoclopramide as a treatment for mother risk, for morning sickness. And there's a cited source. If you look at the ACOG Bulletin 52, page 6, it has one source at the bottom that it attributes its algorithm to, and that is to... it's called... It says, figure 1 on page 6 of ACOG. The one source for that algorithm is this Canadian Family Physician source, which was published by Mother Risk, which is a service of Otis, which thanked Barr and Teva profoundly for their support. So we think it's a very direct link, considering no discovery at all was allowed on that issue. With respect to the brand-name defendants, without any discovery, again, plaintiffs put forth evidence of causation that information was suppressed from the FDA, which would have undoubtedly influenced the FDA's categorization of the drug for use in pregnant patients. Reglan's label for gastroesophageal reflux disease carries a category B designation for pregnancy. And Dr. McCrossin testified that he relied on the category B designation in deciding that metoclopramide was safe to use in pregnancy. That's record 5826 on page 37 of our brief. But plaintiffs introduced evidence of test results that showed that metoclopramide was mutagenic in tests on human cells. And the report itself pointed to concerns that drugs such as these, which were approved prior to 1997, may have slipped through the regulatory framework. Based on the categorization criteria for the FDA, it would not appear that a drug that is tested positively as mutagenic in human cells would have a category B designation. More likely, it would carry a D designation. And so it would appear that the FDA did not have that information. There was no evidence back and forth on that issue on the summary judgment motion. We put in the evidence of the test results, but the court found that there was no causation. The record where those mutagenic test results are contained is at 4491 to 4495. And at 4499, there's a discussion about older drugs needing updated analysis. Well, help me on this one. If your client did not take the brand-name drugs, how do we get them into liability? All right, Your Honor. We submit that the district court erred in dismissing plaintiff's claims for fraud or intentional misrepresentation and for negligent misrepresentation against the brand-name defendants as a matter of law. He ruled on causation also, but he also decided that as a matter of law, we didn't state a claim, and we believe that's error under Louisiana law. We believe the issues raised here go beyond those raised in this court's decisions in Damahi and Johnson and that the issues raised here were not addressed in those cases. In Damahi, the decision turned on post-judgment motions, and the plaintiff was required to show that there had been an intervening change in the controlling law in order to succeed. Damahi, unlike the Whiteners, argued that mincing overruled prior Louisiana cases. That's not our contention. This court disagreed with that argument in Damahi. This court relied in Damahi on the second sentence of Louisiana Revised Statute 9,2800.52 to find that the LPLA is the exclusive remedy for products liability suits and that it was the law before and after mincing. This court in Johnson followed the ruling in Damahi. In Damahi and Johnson, there was no discussion of the issues raised here by the Whiteners that the second sentence of 9,2800.52 of the LPLA must be considered in the context of the first sentence. The first sentence of the LPLA, 9,2800.52, states, This chapter establishes the exclusive theories of liability for manufacturers for damage caused by their products. The second sentence appears broader, and the second sentence was quoted in Damahi and in Johnson. The second sentence states, A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this chapter. We contend that the second sentence is limited by the first sentence and that the exclusivity applies to claims for damage caused by the manufacturer's products. That's supported by principles of statutory construction which require that effect be given to the first sentence of 9,2800.52, but it's also supported by the definition of the word claimant, which is in that second what appears to be broader sentence. Claimant, as defined by 9,2800.53, means a person or entity who asserts a claim under this chapter. So in terms of a negligent representation claim or a fraudulent misrepresentation claim against a brand-name defendant whose product is not at issue in the case, the Whiteners are not asserting a claim under this chapter of the LPLA. And so, therefore, we believe that the construction of the LPLA is an issue that may not have been considered previously and is dispositive on these legal issues. Okay, Ms. Barney, you have a red light, and you have saved some time for rebuttal, and you can pick up your argument on rebuttal. Thank you, Your Honor. We'll hear now from Mr. Peck, representing the Plabo. Good morning, Your Honors. Jeff Peck here for Barr Laboratories and Pleve, Inc. I'd like to start, if I may, with Judge Ali's question about what's the claim. The claim that they purport to be attempting to pursue here is a failure-to-warrant claim. You're correct. And that failure-to-warrant claim is preempted because what the plaintiffs are saying, even with the overlay of the allegations of off-label promotion... And by the way, these are generic companies. They don't promote drugs to doctors. That's not what they do. They sell to wholesalers and distributors. But let's take it where it is. Those allegations are in the complaint. The focus is, what are the plaintiffs asking Pleve and Barr Laboratories to do? They're asking Pleve and Barr Laboratories to change the label. Well, they can't change the label because the label has to be the same as the brands. The Supreme Court has spoken to that. This Court has spoken to that on repeated occasions. That's the Mentine case. That is Morris. That is Eckert. That is Johnson. That's Lashley. All of those say those things can't happen. The other thing that they suggest in their brief is that the product should have not been put on the market. They should have withdrawn the product when there was some foreseeability that maybe it's being used in an off-label manner. But that's also barred by the Supreme Court. That's barred by Mentine, and that's barred by Bartlett, which said that you can't solve preemption, you can't solve the issue of not changing the label by taking a product that's been approved by the FDA off the market. So that claim is simply barred, failure to warrant. Now, if you take the allegations of off-label promotion, that's not a claim either. And the reason that's not a claim is because their allegations of off-label promotion are based solely on violations of federal regulations and law. They are based solely on violations of the Food, Drug, and Cosmetic Act and regulations promulgated under that act. And once again, this court has spoken emphatically to that in Lashley and Morris, saying that violations of federal regulations are not available to plaintiffs to pursue as state tort law claims, citing the Supreme Court's decision in Buckman. So this simply is not... there's no claim here. Before we even get to causation, there's simply no claim that's available that's been pled. Well, I mean, it seems like... I mean, their claim is failure to warn about a matter that you did not present to the FDA and that somehow in a backhanded way you are promoting the use of a drug with respect to which there is no warning. And the no warning is because you violated the... I mean, you yourself have undertaken a use of the drug that was not approved. That's what they said. I'm sorry, I didn't mean to interrupt you. That's what they said. I understand that's what they're saying, but here again... If that were true, why wouldn't they have some sort of case? Because they're asking us to do one of two things, change the label or withdraw the product from the market. Both of those are barred under Mensing and Bartlett. They're asking you to do one thing. They want some money. That's what they're asking you to do. Fair enough, Your Honor. Change the label or not. Rather you not change it. But then the other thing that they're alleging are violations of federal law and federal regulations, and they can't maintain a claim based on the fact that we violated it. Some implication of fraud in their claim, it seems to me, because you're deliberately making... Their claim is you're deliberately advertising the use of this drug for something for which it was not approved and with respect to which there has been no warning. And that's some kind of shenanigans underlying that. It has to be underlying their claim in that respect. I've done that twice now, and I apologize. I thought you were finished. Not only is it not a claim for the reasons that I already articulated, Your Honor, but it's also not a claim under the Louisiana Product Liability Act. There's four claims under there. There's composition and construction. There's design, and there's failure to warn, and there's express warranty. In their first amended complaint, they pled composition. There's no issue of manufacturing defect, no issue of design defect, and the failure to warn claim we've already dealt with. So that claim is not available to them as a state law claim under the LPLA, which, of course, is exclusive, the exclusive basis for any claim against a product manufacturer. Unless you view it as a failure to warn claim. That just seems to me that that's implicit in what they're saying, if not explicit. Right, but again, Your Honor, they're suing a generic company. A generic company can't change the label. They're asking put something else in the label because of off-label promotion. We can't do that. We have to follow the brands. Aren't they just saying don't promote it for something that has not been approved? Don't include this information in the bulletin that the doctor relied upon? Well, that wasn't included by any of the drug companies, Your Honor. That's based upon a determination that ACOG made, and as it says in that bulletin, they made it based upon a literature search, including of the Cochran Library and other resources. They didn't rely upon or say that they relied upon anything that was done by any drug company in doing that. And that was not placed there by any drug company. And the two drug companies they cite are not even the two that are in front of the court right now. This is Bar Laboratories and Pleva. But to the extent that they are saying that there is something wrong with off-label promotion, again, you can't define off-label promotion unless you reference it to the Food, Drug, and Cosmetic Act. It is by its nature has to be a violation of the Food, Drug, and Cosmetic Act, which again places it right within Morrison, Lashley, and Buckman. Your Honors, if I can move on to causation. Your Honors, the issue of what caused Dr. McCrossin to prescribe this, he summed up very nicely, and this is at Record 2412. It's page 71 of his deposition. And this is after he said, of course, he's never talked with a drug company, any drug company about metoclopramide, he doesn't know who Pleva or Bar Laboratories is, never had any conversations at all, never had any samples at all, never done any Internet research at all about it. Nothing from any kind of drug companies. Here's what he said. He said at page 71. Again, this is 71 of the deposition 2412. Again, my clinical experience. My clinical experience shows that Reglan works good to control nausea and vomiting associated with pregnancy. So that's what I use. And he said again, the question he was asked, well, why would you use Reglan instead of Zofran? Another one. And he said, because my clinical experience says that Reglan works well to control nausea and vomiting in pregnancy and I didn't have much experience using Zofran as an anti-antibiotic. And then he also says at page 23, or pardon me, at page 238788 of the record, he also talks about how it's a safe medication experience. And then at page 2385 he says it's a medication that works and is useful. He said over and over that he relied on his experience with this medication, with Reglan, in making the decision. He didn't make the decision based on the ACOG guidelines or anything like that. His testimony was in his deposition that he partly relied upon the information in the bulletin. Your Honor, when he was asked specifically, he said he had read it. When he was asked specifically what documents he relied upon in prescribing the Mediclopramide to Ms. Whitener in July of 2008, at 2369, he said he didn't rely on any documents. And to the same effect, 2372. Both of those situations he said he didn't rely on it. He also referenced the information in the bulletin in his deposition. He did. I agree, Your Honor. He did. He did reference it. But if you look at it and what the bulletin sets forth in terms of Mediclopramide, he didn't even follow the algorithm that's there that they are making a big deal of. Pardon me? Four-step process. That's right. He didn't follow it. And he said that all of these medications, this is at 5390, that were in there, whether it's doxylamine or it's Phenergan or it's Mediclopramide, he said they're all safe to use. He just said in his experience he prefers to use Mediclopramide because it's been safe and effective. Did he ever say how he first got started using this? He did, Your Honor. He said that he first was exposed to it. I see my time is up. May I take a moment to answer your question? He did say that he was exposed to it the first time in 2000 in his first year of residency when he learned about it. He learned about that it was a mainstay of what doctors use and what they determine to prescribe for nausea and vomiting, and then from there his experience proved that out. And it's clear that it's the medication that he was most comfortable with based on his experience. Okay. Thank you, Mr. Peck. Thank you, Your Honor. Mr. Ethimer? No, no, no, no. No, no, Mr. Ethimer, you're next. Rebuttal comes a little later. Sorry. That's okay. No problem. Thank you, Your Honor. Richard O. Ethimer. I represent Teva Pharmaceutical Industries Limited, an Israeli corporation. I'll refer to it as Teva Limited to distinguish it from Teva Pharmaceuticals USA, Inc., an indirect subsidiary that was a defendant in this case below, but has been dismissed on appeal by joint motion in this Court's July 31st order because Mrs. Whitener never received any Teva metoclopramide. Teva would have the benefit of all the merits defenses that the other defendants have, and indeed there's no plausible claim against Teva Limited on the merits, but Teva Limited was dismissed by Judge Fallon on personal jurisdiction grounds. Why wasn't any discovery allowed for the personal jurisdiction claim? Well, there was discovery. I don't think there necessarily needed to be any as this case evolved, but there was discovery. Teva Limited was named in regular litigation in Philadelphia, a coordinated state court proceeding. There was a deposition, a jurisdictional deposition of Teva Limited. We invited Plaintiff's Counsel to participate in that deposition. They declined the offer. In response to the first motion, it was a different loss. It was state court litigation in Pennsylvania, but it also involved the same drug, Reglan and generic metoclopramide. They were invited to participate in that deposition. They declined the offer. Was it a jurisdictional deposition? Yes, it was. It addressed U.S. contacts of Teva Limited as well as veil-piercing theories between Teva Limited and Teva USA. It was a comprehensive deposition. Ultimately, we provided at Judge Fallon's direction, provided the transcript and all the exhibits to that deposition. The deponent was Kobe Altman, who provided an affidavit below. That was all provided to Plaintiff's Counsel, so they did have the benefit of all of that discovery. Ultimately, Judge Fallon, there were two orders on this issue. In June 2011, he issued his first order stating that plaintiffs had articulated no basis for specific jurisdiction, that they could only succeed with general jurisdiction. He ordered us to provide that transcript, and then we had further supplemental briefing on that. Respectfully, I think if Judge Fallon had had the benefit in 2011 of the subsequent Supreme Court general jurisdiction decisions, I think the case probably would have ended against Teva Limited then, as opposed to a year later with his April 2012 order. This Court has very recently, in a published opinion that postdates all the briefing here, this Court has articulated the analysis, and I provided Ms. Barney a copy of the case yesterday, and let me provide the site. The case is Moncton, M-O-N-K-T-O-N, Insurance Services v. Ritter, reported at 768 F. 3rd, 429. What's the date? Excuse me? The date? The date? September 26, 2014. So just after... It was out before your briefing was completed. No, we filed our brief at the beginning of September, and I think the plaintiff's reply brief was in mid-September. Did you file a 28-J letter? We did not file a 28-J letter, and I'd be happy to do that afterwards, but the decisions, it's a relatively short decision, but it says that jurisdiction is either specific or general. Plaintiff, after Judge Fallon said there was no basis for specific jurisdiction, plaintiffs never argued that again, and I would say that it's arguable they've waived a specific jurisdiction claim, but specific jurisdiction under the Supreme Court's 2014 Walden v. Fiori requires a substantial connection of the defendant's informed contact to the litigation. There's none even argued or articulated. General jurisdiction... I'm sorry, I see my time's up. General jurisdiction, the corporation has to be, and in fact what this Court said in that decision is it's incredibly difficult to establish general jurisdiction anywhere but where the corporation is incorporated and has its principal place of business, which in this case is Israel. And last point is discovery. That's reviewable only for abuse of discretion. Thank you. Thank you. Mr. Bullock, we'll hear from you. Representative Allavan. Good morning, Your Honors. Hank Bullock on behalf of the Brand defendants, Allavan, Mehta, and Schwarz. May it please the Court, in DeMahie v. Schwarz-Farma and again in Johnson v. Teva, two separate panels of this Court held that a plaintiff who ingested only the generic version of a drug cannot bring suit under Louisiana law against the brand name manufacturer of the competing drug. That was true for two separate reasons. First, the Louisiana Product Liability Act provides the exclusive remedy under Louisiana law for a plaintiff who alleges injury caused by the use of a product. And under that statute, under the LPLA, the plaintiff may only bring suit against the company that manufactured the product that allegedly caused the injury in question. In both DeMahie and Johnson, the plaintiffs conceded that they never took any brand name product, and as a result, the LPLA barred their claims against the brand name manufacturers. Second, the claims in DeMahie and Johnson failed, as they will here, for the separate and independent reason that Louisiana law imposes no duty to warn on a brand name manufacturer running to those who take a third-party competing generic version of the product. Appellants' claims in this case are identical to those presented in DeMahie and Johnson. Identical. And in that respect, under this Court's prior decisions, most notably, I believe, FDIC v. Abraham, Johnson and DeMahie control, and we would respectfully request that this Court affirm the dismissal of the claims against the brand defendants. Now, as I listened to my colleague's argument today, she did not dispute the holdings of Johnson or DeMahie, but instead made, as I understand it today and in her briefing, two arguments in an attempt to avoid the application of those cases. But each of those arguments fails. First, as I understand it, my colleague argued that this case is different because the LPLA does not apply to her claims against the brand name manufacturers. Her argument is that because the brand name defendants did not actually manufacture the pill that the plaintiff allegedly ingested and that allegedly caused her injuries, they are not manufacturers within the definition of the LPLA and therefore not subject to its requirements. Frankly, that argument simply ignores what this Court expressly held in both DeMahie and Johnson. And indeed, looking at the Johnson opinion, it makes clear Johnson argues that brand defendants are not manufacturers under the LPLA because they did not manufacture the product Johnson consumed. However, we rejected this same argument in DeMahie. And if you look at the DeMahie opinion as well, a panel of this Court said that argument was unavailing. So in that respect right there, the plaintiff's claims are barred under both Johnson and DeMahie and they fail as a matter of Louisiana law. Is there any allegation that the drug that the plaintiff took was any different chemically than the drug, the brand drugs? Your Honour, I think for purposes of this appeal, we would agree that the generic drug is bioequivalent. That's a little different from chemically the same because there is a realm of leeway in difference. They are bioequivalent, but this Court's prior decisions make clear that that has no bearing on the ability to bring claims against a brand manufacturer. The generic labelling is tied to the brand labelling, correct? Your Honour, the generic... I apologise. The generic manufacturer has an obligation to at all times copy or use the FDA-approved labelling, which in this case was that of the brand manufacturer. But even in that instance, and even with those questions being asked and those arguments having been raised in both Johnson and DeMahie, two different panels of this Court rejected those arguments, both, as I said, under the LPLA, but also for the separate reason that a brand-name manufacturer simply has no duty to warn about the risks associated with competing generic products. And in doing so, both DeMahie and Johnson relied on the express holding of the Louisiana Court of Appeals decision in the Stanley case. That is a case that, again, is just like this case, a plaintiff asserting claims against a brand manufacturer for injuries conceivably caused only by the generic product, and that case expressly rejected the claims for lack of duty. And notably, plaintiffs cite to no authority in their briefing or didn't even mention it at argument today, that calls into question, much less rejects or overrules, that holding in Stanley. And indeed, that holding in Stanley was expressly relied upon by both the DeMahie and the Johnson courts. Lastly, Your Honour, if I could just address the third basis upon which the district court dismissed the claims against the brand manufacturers. That was for lack of causation. I won't reiterate the arguments that Mr. Peck made as to all of the various reasons and statements in the record that make clear that Dr. McCrossin did not rely on any statements whatsoever by any defendant in this case. All I will add is that it is undisputed that the brand-name manufacturers in this case never marketed or did any promotion with respect to this product. Tellingly, when... With respect to the generic product. With respect to the brand or the generic product. Metta, Allivan and Schwarz all came into this product in the 2000s, long after any promotion of the drug had ceased. But in any event, when Ms. Barney was asked about ACOG and the bulletins and the like that the doctor may or may not have relied upon, she made clear that the only defendants to which that bulletin could be tied were Teva and Barr, neither of which are my clients. It's undisputed they had nothing to do with that guideline whatsoever. And lastly, to the extent that the plaintiffs now argue that causation can somehow be tied to a failure of the brand defendants to provide information to the FDA, I would just note that that claim has been found to be preempted both by the Supreme Court in Buckman as well as by this Court in its Lofton decision. Okay. Thank you, Mr. Bullock. Thank you, Your Honor. Now, Ms. Barney, we'll hear from you in rebuttal. Thank you, Your Honor. With regard to what's the claim, we do not bring a federal claim for violating off-label promotion rules. We bring a failure-to-warn claim that we submit is not preempted. And so our failure-to-warn claim against the generic should be allowed to proceed because it's not preempted. Our claim against the brand names is a negligent misrepresentation and fraudulent misrepresentation claim that is not barred by Louisiana law. What we're asking, they ask, what are we asking them to do? Their two options were to either create a label for this use. Well, I mean, if it's a failure-to-warn claim, I mean, it's preempted. Your Honor, we submit that it's not because under mincing . . . Well, I know you submit that, but . . . I think the law is on our side. Under mincing, you have to have . . . They are not even a generic for this use. They cannot apply for an ANDA for a generic version of a drug that is designed to treat morning sickness of pregnancy. They would have to . . . There would first have to be a label for that use for them to apply for an ANDA and be a generic for that use. What are the limitations on mincing, then, with respect to failure-to-warn? It would be that if you don't have a federally approved label for this use, then you don't have a duty of sameness. You're not even a generic. You can't even apply for an ANDA because nobody has the approved label. It's a warning label. So the warning label is designed to address a particular use. If you don't have a federally approved warning label for the treatment of nausea and vomiting of pregnancy, you don't have a duty of sameness that you can go get an ANDA for and copy. And we've set that out in detail. The regulations, the primary one at issue is 120 . . . I'm sorry, CFR 201.128. And it says that if a manufacturer knows or has knowledge of facts that would give him notice that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or other than the ones for which he offers it, he is required to provide adequate labeling. There's been no analysis . . . You said the generic drug here is not the equivalent of the brand name that has been approved. No, Your Honor, what I'm saying is that because no one has ever gone and gotten an approved label for this use, if you look at the federal regs, it's all about the use of the drug. That's why earlier when I used the example of the drug that had two approved uses, it had two brand labels, and it's going to have two generics for the same medicine. The warning label is driven by the use. So if you don't have an approved warning . . . But I thought the law . . . I mean, as I understand it, I thought the law as it exists requires the generic to have the same warning as the brand label. It does for that use. But if you look at the . . . And we've laid this out on . . . But then no other use is approved. Correct. So then what you have . . . So with the generic . . . A violation of the FDA regulations, then. We do not contend, unlike mincing, we do not contend that they have to change a warning label. They have the burden of showing that it was impossible for them  You've got a violation of the law here instead of a failure to warn. I'm sorry? Why don't you have a violation of the FDA regulations, that is, an unapproved use of the drug, as opposed to a failure to warn? How do you warn against an unapproved use of the drug? In mincing, the decision was made because the generic was in an impossible position. There was a label approved for the use at issue, and the generic could not change it. We're not asking them to change their label. They have not demonstrated to this court, and nobody has required them to show, that it's impossible for them to go get a label for this use. Then there would be a warning label for this use that could offer some preemption and could allow a generic to even apply for an ANDA. But there isn't one. Is there a cause of action in your favor for violation of FDA regulation by an unapproved use of the drug? Your Honor, we've cited, I believe it's the Exxon case, in our lower court filings. That's not what you're suing. A violation of a federal standard can demonstrate a basis for liability under state law, but we are not bringing a federal claim. What we are saying is that we have a failure to warn claim until you show us that it was impossible for you to comply with both federal and state law. There is no label that they had to change. The other issue is that they can refrain from off-label promotion, and I believe they cited Bartlett or Buckman, and the Louisiana Supreme Court has recognized... You've got a red light, but... I'll give you one minute, okay? Okay, thank you. The Supreme Court has recognized that the stop-selling option is a viable option when you're not supposed to be selling anyway. It's in a footnote, and I apologize. It's either Bartlett or Buckman, and as I stand here, I can't tell you which one. But they have said that the stop-selling option is a valid alternative when you're not supposed to be off-label promoting anyway. So under the original mincing decision, we don't believe it's preempted. Under off-label promotion, they certainly can comply with both. We do dispute, quickly, DeMahe and Johnson. We think they got the LPLA discussion wrong. We were trying to avoid an en banc hearing or a certification by pointing out that we're making different arguments. Also, Stanley itself rejects the construction of the LPLA that's been given to it because... I think you're correct, and I'm sure they're covered very well in your brief. All right, thank you, Your Honor. I appreciate your time.